**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| JOHNATHON HOLBROOK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HIMS & HERS HEALTH, INC.,<br><br>Defendant.<br>_______________________________/ | CASE NO. ______________<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Johnathon Holbrook ("Plaintiff" or "Mr. Holbrook"), individually and on behalf of all others similarly situated ("Class Members," or the "Class"), brings this Class Action Complaint against Defendant Hims & Hers Health, Inc. ("Hims" or "Defendant"), and alleges as follows based on personal knowledge as to Plaintiff's own acts and on information and belief as to all other matters:

## NATURE OF THE ACTION

1. This is a class action arising from Hims's collection and disclosure of Class Members' sensitive health information and electronic communications, including to Amplitude, Inc. ("Amplitude"), Datadog, Inc. ("Datadog"), Meta Platforms, Inc. ("Meta"), Snap Inc. ("Snap"), Reddit, Inc. ("Reddit"), Microsoft Corporation ("Microsoft"), Pinterest, Inc. ("Pinterest"), Google LLC ("Google"), and The Trade Desk, Inc. ("The Trade Desk") (collectively, the "Third-Party Recipients"), without prior notice and consent, through tracking technologies Hims deployed on its website, www.hims.com (the "Website").

2. Hims is a San Francisco–headquartered, New York Stock Exchange–listed direct-to-consumer telehealth company. It sells prescription treatments for erectile dysfunction, premature ejaculation, hair loss, weight loss, depression and anxiety, low testosterone, acne, and skin conditions to approximately 1.1 million active subscribers, and reported approximately $1.48 billion in revenue for fiscal year 2025. Its customer-acquisition model depends on paid digital advertising, which is the business reason the tracking technologies described below are deployed.

3. The Website functions as a treatment-seeking tool. Hims sells nothing off the shelf: every prescription purchase begins with an online health questionnaire that Hims calls an intake flow or "consultation." A visitor who wants to use the service must first disclose, question by question, the condition for which he seeks treatment, his symptoms, how those symptoms disrupt his life, his treatment goals, his current mood, his family medical history, and his date of birth. The Website also runs the same answer-capturing questions outside the purchase funnels: an online "Low Testosterone Symptom Calculator" that requires no account and asks eight symptom questions; a quiz that appears on the Website's homepage; and quizzes embedded in ordinary editorial articles.

4. Unbeknownst to Website visitors, Hims has knowingly implemented tracking technologies operated by the Third-Party Recipients (collectively, the "Trackers") that acquire visitors' communications in real time. The moment a visitor selects an answer to a health question, the answer itself—in plain, readable text—is transmitted from the visitor's browser to Amplitude, an outside product-analytics company, and written into a durable per-person profile Amplitude maintains on its own servers. Datadog receives the same funnel activity tied to the same visitor and, on the sexual-health and weight-loss funnels, the selected answer itself. Separately, when a visitor merely views one of Hims's health-condition or prescription-product pages, that visit—

labeled with the condition—is transmitted on page load to advertising platforms including Meta, Snap, Reddit, Microsoft (Bing), Pinterest, and Google, and to The Trade Desk, an identity-resolution company whose business is matching an anonymous visitor to a real, named advertising profile. Hims also routes the same condition-labeled events from a relay on its own servers to additional platforms, including TikTok, X (formerly Twitter), and PulsePoint, a server-to-server path that bypasses browser-based ad blocking.

5. What aggravates Hims's conduct is the timing and manner of these disclosures. The transmission to Amplitude fires as the answer is selected—before the visitor creates an account and before any consent control appears. On several surfaces, including the Low Testosterone Symptom Calculator, the homepage quiz, and the editorial quizzes, there is no consent control at any point. The only site-wide control Hims presents is a small "Your privacy choices" notice whose sole button is "Got it": it offers no way to refuse, it appears only after every advertising tracker has already fired, and the Website does not honor the Global Privacy Control opt-out signal the visitor's browser transmits. The transmissions themselves record the absence of consent—each Amplitude payload carries privacy_consent_analytics: "Auto," a software-library default rather than the product of any user interaction, together with is_logged_in: false. Hims's own front-end code names the banner it relies upon "custom-wiretap-banner."

6. Nor do the documents Hims does present authorize the conduct. The advertising-partner disclosures in Hims's Privacy Policy name Google, DoubleClick, Facebook, X, and Stripe. They do not name Amplitude or Datadog—the two companies that actually receive the visitor's health answers—and they do not name TikTok, Snap, Pinterest, Reddit, or The Trade Desk. The Telehealth Consent, the document a mid-funnel checkbox says the visitor "agree[s]" to, is titled

an authorization to use and disclose medical information for treatment; it never mentions advertising, analytics, pixels, or cookies at all.

7. This interception of private electronic communications occurs without appropriate notice to visitors and without their consent, in violation of the Florida Security of Communications Act, Fla. Stat. § 934.01, et seq. (the "FSCA").

8. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Hims violated the FSCA by deliberately embedding the Trackers on its Website, thereby procuring the Third-Party Recipients to intercept visitors' private electronic communications—the very answers to the health questions Hims asked them—in real time and without their consent.

9. Independent of that statutory violation, Hims owed Plaintiff and Class Members a duty of confidence and breached it. Visitors disclosed their conditions, symptoms, moods, treatment goals, and medical histories to Hims in confidence, for the purpose of obtaining medical treatment from a company that advertised its service as "100% online, private, and secure" and represented that a visitor's "medical records and sensitive information are only accessed by the medical providers managing your care." Hims instead routed those disclosures to analytics and advertising companies for its own commercial benefit.

10. Further, Hims solicited and obtained visitors' sensitive health information and put that data to use for advertising, analytics, conversion-optimization, audience-building, and subscriber-acquisition purposes, without ever compensating them for the value it received. Hims has thereby been unjustly enriched at Plaintiff's and Class Members' expense.

11. Hims's conduct is also an unfair and deceptive trade practice. Plaintiff therefore asserts a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. ("FDUTPA")—solely for the declaratory and injunctive relief that Fla. Stat. § 501.211(1) makes available to "anyone aggrieved by a violation" of the Act, and expressly not for damages.

12. On July 29, 2026, the Federal Trade Commission, the People of the State of California, and the Utah Division of Consumer Protection filed a joint enforcement action against Hims in the United States District Court for the Northern District of California, captioned *Federal Trade Commission v. Hims & Hers Health, Inc.*, No. 3:26-cv-07871-VC (N.D. Cal.) (the "FTC Action"). Count I of the FTC Action alleges that Hims deceptively represented that "[s]ensitive health information provided by Users to Hims is only accessed by medical providers providing care," that "Hims' services are private," and that "Hims' services are discreet," when in fact such information "has been shared with third-party Advertising Platforms." Count II alleges that Hims failed to disclose the sharing at all.

13. The government's allegations describe the same practice, at a scale that only Hims's own records could reveal: that Hims uploaded approximately 14 million consumer email addresses to Meta, of which Meta matched approximately 10 million to Meta user identifiers; that Hims transmitted its "Complete Registration" and "Purchase" events to Meta approximately 8 million times, with parameters combining each consumer's email and IP address with the treatment sought; that Hims labeled the resulting advertising audiences with codewords—"Apollo" for mental health, "Atlas" for premature ejaculation, "Zeus" for erectile dysfunction—and then told Meta what the codewords meant; that Hims uploaded lists containing over one million email addresses to Snap under names such as "AllTime_Hers_MH_SignUps" and "AllTime_RX_PEJ"; and that Hims placed advertising pixels from at least fourteen further platforms on the Website.

The FTC further alleges that Hims did not stop when consumers complained, and did not stop when it learned of the FTC's investigation.

14. Plaintiff asserts no claim under the FTC Act, the Restore Online Shoppers' Confidence Act, or any other federal statute, and this Complaint does not depend on the outcome of the FTC Action. That action is alleged here because it confirms, from the defendant's own documents and by the considered judgment of three government enforcement authorities, both that Hims disclosed its users' health information to advertising companies and that Hims made the privacy promises that render those disclosures a breach of confidence and a deceptive practice.

15. Through this action, Plaintiff seeks to hold Hims accountable for these privacy violations, to obtain appropriate remedies for affected Florida residents, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

## PARTIES

16. Plaintiff Johnathon Holbrook is an adult citizen and resident of the State of Florida, residing in Jacksonville, Duval County, Florida.

17. Defendant Hims & Hers Health, Inc. is a Delaware corporation with its principal place of business at 2269 Chestnut Street, #523, San Francisco, California. Hims is publicly traded on the New York Stock Exchange under the symbol "HIMS." Hims owns, operates, and controls the Website and its "Hers" counterpart at www.forhers.com, and reported approximately 1.1 million active subscribers and approximately $1.48 billion in revenue for fiscal year 2025. Hims is a citizen of Delaware and of California. Hims is not a citizen of Florida.

## JURISDICTION AND VENUE

18. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed Class; and at least one member of the proposed Class is a citizen of a State different from Defendant. Plaintiff and the members of the proposed Class are citizens of Florida, and Defendant is a citizen of Delaware and California.

19. Plaintiff asserts claims arising exclusively under Florida statutory and common law. Plaintiff asserts no claim arising under the Constitution, laws, or treaties of the United States, and this Court's jurisdiction rests solely on 28 U.S.C. § 1332(d).

20. The amount in controversy is satisfied. The FSCA entitles each person whose electronic communications are unlawfully intercepted to liquidated damages computed at the higher of $100 per day for each day of violation or $1,000, together with punitive damages and reasonable attorneys' fees and costs. Fla. Stat. § 934.10(1). The proposed Class consists of, at minimum, tens of thousands of Florida residents, and the aggregate amount in controversy therefore exceeds $5,000,000. Plaintiff's claims for restitution and disgorgement and for injunctive relief further add to the amount in controversy.

21. None of the Class Action Fairness Act's exceptions to jurisdiction applies. The discretionary and mandatory declination provisions of 28 U.S.C. § 1332(d)(3) and (d)(4) each require that the primary defendant, or a defendant from whom significant relief is sought, be a citizen of the State in which the action was originally filed. Defendant is not a citizen of Florida, and Defendant is the only defendant.

22. This Court has personal jurisdiction over Defendant under Fla. Stat. § 48.193(1)(a)1., 2., and 6., and § 48.193(2), and consistent with due process. Hims operates, conducts, engages in, and carries on a continuous and systematic business in Florida: it markets its telehealth services to Florida residents through targeted digital advertising, including the Facebook advertisement that brought Plaintiff to the Website; it contracts with medical providers licensed in Florida to serve Florida patients; it causes prescription medications to be dispensed and shipped to Florida residents; and it collects subscription payments from Florida residents. The acts giving rise to Plaintiff's claims were purposefully directed at Florida: the tracking code Hims deployed executed in Plaintiff's browser, on Plaintiff's device, in Jacksonville, Florida, and acquired Plaintiff's communications there.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiff accessed the Website and communicated his health information from Duval County, Florida, and the interception of his electronic communications occurred there. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (d), because Defendant's contacts with this District would be sufficient to subject it to personal jurisdiction if this District were a separate State.

24. Assignment to the Jacksonville Division is proper. Duval County lies within the Jacksonville Division of the Middle District of Florida, 28 U.S.C. § 89(b), Plaintiff resides in Duval County, and the claims arose there.

## FACTUAL ALLEGATIONS

### A. Overview of Website Tracking on Health Care Websites

25. Many websites employ tracking technologies that collect personal data about users' online activities. These technologies have become ubiquitous across the internet, collecting vast

amounts of data about user behavior, preferences, and interests. In the health care context they are particularly concerning, because they can capture sensitive medical information, including the conditions a user is researching, the symptoms a user reports, and the treatments a user seeks.

26. The concern is at its highest on a direct-to-consumer telehealth website. A telehealth intake questionnaire is the digital equivalent of the conversation that takes place in an examination room. The visitor is not browsing; the visitor is answering a medical question, put to him by the company he has come to for treatment, in the expectation that his answer goes to a clinician. Capturing that answer as it is typed or clicked, and routing it to outside analytics and advertising companies, discloses the substance of a medical consultation to parties who have no role in it.

27. As detailed below, Hims has implemented tracking technologies on its Website that result in the Third-Party Recipients' unauthorized interception of visitors' electronic communications, including the answers to the health questions the Website asks.

**B. Hims's Business Model: No Purchase Without an Answer to a Health Question**

28. Hims operates a managed-services platform that connects consumers to affiliated medical groups, licensed physicians, pharmacies, and laboratories. The consumer pays Hims directly, by subscription or one-time purchase. Hims manages the intake questionnaire, the electronic health record, the prescription workflow, and pharmacy fulfillment. Hims is neither a pharmacy nor a medical practice; it is the layer through which the consumer's health information reaches the clinician, and the only channel through which the consumer may communicate with that clinician.

29. Every prescription purchase begins with an intake funnel. Each funnel is one or two clicks from the homepage and requires no login to begin: the sexual-health funnel for erectile

dysfunction and premature ejaculation at www.hims.com/g/i/sh, one click from the homepage hero "Have better sex"; the weight-loss funnel at www.hims.com/g/i/wm, one click from the GLP-1 hero; the hair-loss funnel at www.hims.com/c/hl, one click from "Regrow hair"; the testosterone funnel at www.hims.com/g/i/tt, one click from "Boost testosterone"; the mental-health funnel at www.hims.com/c/mh; and the anti-aging and acne funnels at www.hims.com/c/aa and www.hims.com/c/ac.

30. The intake flow proceeds in four parts. First, the visitor answers a series of approximately five to fifteen questions concerning his treatment interests, symptoms, and goals. Second, the visitor is asked to select his state and to register an account. Third, the visitor completes a medical assessment of between roughly twenty-five and fifty questions concerning his medical history. Fourth, the visitor is shown a potential treatment, its price, and its refill cadence, and is directed to enter billing and shipping information. The health answers at issue in this Complaint are transmitted at the first stage—before any account exists.

31. Hims also runs the same answer-capturing mechanism on surfaces that require no account and are not part of any purchase funnel: the Low Testosterone Symptom Calculator at www.hims.com/lp/tt-start-testo-symp-calc, reachable in two clicks from the footer "Tools" menu; a quiz or pre-quiz modal that appears on the Website's homepage; and quizzes embedded in editorial articles, such as the hair-trait quiz at www.hims.com/check/what-haircut-should-i-get-quiz.

## C. The Tracking Technologies Deployed on the Website

32. Amplitude, Inc. is a publicly traded product-analytics company (NASDAQ: AMPL) headquartered in San Francisco, California. Amplitude's business is ingesting behavioral data onto its own servers and converting it into durable user profiles, audience segments, and

engagement products that it sells to its own customers. Amplitude does not merely hold data on Hims's behalf; it processes what it receives on its own infrastructure, for its own commercial platform. Hims has implemented Amplitude's technology on the Website, including inside the intake funnels and quizzes, and transmits visitors' selected health answers to api.amplitude.com.

33. Datadog, Inc. is a publicly traded monitoring and analytics company (NASDAQ: DDOG). Hims has implemented Datadog's technology on the Website, which ingests the visitor's funnel session into Datadog's own analytics product on Datadog's own infrastructure, cross-linked to the same visitor identified in Amplitude's copy, and which on the sexual-health and weight-loss funnels also captures the selected answer itself.

34. Meta is a multinational technology company that operates Facebook and Instagram and one of the world's largest advertising platforms. Its business model depends on collecting user data across contexts and using it to target advertising. Hims has implemented the Meta Pixel and Meta's Conversions API on the Website, and, as the FTC Action alleges, has also uploaded customer lists to Meta for audience matching.

35. Snap, Reddit, and Pinterest each operate a social-media and advertising platform together with an advertising pixel. Hims has implemented each of their pixels on the Website, which transmit information about visitors' interactions—including the health-condition page visited—together with each platform's persistent advertising identifiers.

36. Microsoft collects user data through its Bing search and advertising network and its Universal Event Tracking ("UET") tag. Hims has implemented Microsoft's UET tag on the Website; when a visitor loads a page carrying the tag, information about the page and the visitor's activity is transmitted to bat.bing.com together with Microsoft's MUID cookie.

37. Google operates one of the world's largest online advertising platforms and generates most of its revenue from targeted advertising. Hims has implemented Google's advertising and analytics technology on the Website, including conversion and Floodlight activity routed through a first-party-cloaked server-side tag manager at tm.hims.com, which transmits the funnel or condition page and a durable advertising identifier to Google.

38. The Trade Desk, Inc. is a publicly traded advertising-technology company (NASDAQ: TTD) whose core business is identity resolution and audience resale: it exists to convert an anonymous visit into a named, marketable profile and to sell access to that profile across the open web. Hims has implemented The Trade Desk's pixel on at least forty-seven of the Website's health-condition and product pages, where it receives the visitor's identifiers and matches them against The Trade Desk's cross-web identity graph.

39. In addition to the browser-based Trackers, Hims operates a relay on its own server infrastructure—observed at endpoints including us-central1-clubroom-prod.cloudfunctions.net—that posts the same condition-labeled events to platform endpoints server-to-server. Because that path originates from Hims's own servers rather than the visitor's browser, it is not visible to, and cannot be blocked by, browser-based privacy tools. For TikTok, X, and PulsePoint, the relay is the only observed transmission path, and the onward receipt by those platforms is a subject for discovery against Hims's relay configuration and server logs.

40. Each of the Third-Party Recipients' own privacy disclosures confirms that it uses the data it collects to advertise and market to users, including by targeting advertising and by combining data collected from different contexts to build unified profiles. For these recipients, the health-condition signal is not incidental to some service performed for Hims; it is the product.

41. When a visitor loads a page on the Website, the visitor's browser sends an HTTP request to the Website's server. In response, the server returns the webpage, which contains small pieces of code known as trackers, tags, or pixels. That code instructs the browser to send the visitor's interactions—along with identifying data such as cookies, browser details, IP address, and device information—to the Third-Party Recipients, in real time and in parallel with the visitor's communications with Hims.

42. The transmissions described below are documented in the figures that follow, which are drawn from live network-inspection captures taken in the Chrome DevTools Network panel on the Website, and from the decoded outbound request payloads reflecting the real-time requests generated when a visitor interacts with the Website.

**D. The Intake Funnels Transmit the Visitor's Health Answers to Amplitude and Datadog in Real Time**

43. On each intake funnel, the moment the visitor selects an answer to a health question, the browser issues an HTTP POST request to api.amplitude.com. The request payload carries the answer the visitor selected in the selected_choices and selected_choices_one_line fields of an event Hims names visit:selected_visit_use_case. The browser then issues a second POST carrying an $identify event that writes the same answer into a durable Amplitude user profile, in the field user_properties.$set.selected_consult_choices. The answer is therefore taken twice: once as a transient event, and once as a lasting attribute of a per-person record. Both transmissions fire while the visitor is logged out, and before any consent control appears.




*Figure 1: The sexual-health intake at www.hims.com/g/i/sh. The visitor selects "Getting hard and staying hard" (left), and the browser posts the answer to api.amplitude.com (right) in the companion $identify call, which writes selected_consult_choices = ["i-sh-getting-hard-and-staying-hard"] into the visitor's durable Amplitude user profile.*

44. On the sexual-health funnel, the Website asks "How do you want to improve your performance?" When the visitor selects "Getting hard and staying hard," that answer is transmitted to api.amplitude.com as selected_choices = ["i-sh-getting-hard-and-staying-hard"], in an event whose visit_type is "ED," and is written to the visitor's durable Amplitude profile by a companion $identify call issued in the same instant. The answers that follow are transmitted the same way: "How often do your symptoms disrupt your sex life?"—"Pretty often"; "Have you tried treatment before?"—"No"; "How would you like to approach treatment options?"—"I'd like a recommendation"; and the visitor's selected state.




*Figure 2: The visitor's self-reported mood on a psychiatry intake transmitted verbatim to api.amplitude.com as selected_choices = ["Sad"], in an event whose visit_type is "PSYCHIATRY," followed immediately by an $identify write of the same value to the visitor's persistent profile.*

45. On the mental-health funnel, the Website's first question is "Before we get started—how are you feeling today?" When the visitor selects "Sad," the word "Sad" is transmitted verbatim to api.amplitude.com as selected_choices = ["Sad"], in an event labeled with the visit type "PSYCHIATRY," and is written to the visitor's persistent Amplitude profile. Later answers on the same funnel are transmitted the same way, including "How much experience do you have with medication?"—"First timer"—and the visitor's state and date of birth, the latter transmitted as an age, a birth year, and an age bracket.




*Figure 3: On the hair-loss funnel the answer travels as the visitor's own English sentence rather than as a code—selected_choices = ["Receding hairline, want to slow its progress"].*

46. The hair-loss funnel is the most extensive. Thirteen separate answers were confirmed transmitted verbatim to api.amplitude.com, and on this funnel the answers travel as the visitor's own English sentences rather than as internal codes: "Which best represents your hair loss and goals?"—"Receding hairline, want to slow its progress" and "Experiencing hair loss, ready to start treatment ASAP"; "Where are you noticing changes to your hair?"—"All over"; "How much hair have you lost?"—"A lot"; "When did you start noticing changes to your hair?"—"In the past few months"; "Does hair loss run in your family?"—"Yes," transmitted in an event whose page field is "family_history"; "How often do you tend to experience stress?"—"All the time"; the visitor's hair type, length, and styling; the visitor's state; and the visitor's date of birth, transmitted as an age, a birth year, and an age bracket. Several of these answers were also written to the visitor's durable Amplitude profile.

47. The hair-loss funnel also carries an affirmative representation that contradicts what the code does. Beneath the answer choices, the page states: "The quiz is not a medical assessment

and your responses will not be shared with a medical provider. Hims uses your responses to personalize your experience and for other uses as described in our Privacy Policy." The first sentence is a representation that the answer is not going to a clinician. It is accurate as far as it goes—and it is precisely the point: the answer serves no treatment purpose whatever, yet Hims transmits it in the same instant to two outside analytics companies and writes it into a durable commercial profile of the visitor. The second sentence does not cure that. A reference to "other uses as described in our Privacy Policy" is not notice of interception by Amplitude and Datadog, which that Policy never names.

48. On the weight-loss funnel, the answers transmitted to api.amplitude.com include the treatment the visitor has in mind ("GLP-1 pills"), the visitor's weight-loss goal ("Losing 16-50 lbs," transmitted as i-wm-hims-16-50-lbs), the form of GLP-1 medication the visitor selects ("Pills," transmitted as i-wm-hims-pills), and what reaching a goal weight would mean to the visitor ("Improving overall health"). On the testosterone funnel, the answer to "Which areas of your health are you looking to improve?" is transmitted as selected_choices = ["i-tt-energy"] in an event whose visit type is "TMNT." On the acne and skin funnels, the answer to "What goals do you have for your skin?" is transmitted verbatim as selected_choices = ["Get rid of dark spots"] in an event whose visit type is "SKINCARE_AGING."

49. Datadog receives the same funnel activity, cross-linked to the same visitor by the same device identifier that appears in Amplitude's copy, on every funnel; and on the sexual-health and weight-loss funnels, Datadog's interaction tracking also carries the selected answer itself, verbatim and unmasked, in plain text.

50. Neither Amplitude nor Datadog is named anywhere in Hims's Privacy Policy.

**E. The Low Testosterone Symptom Calculator Transmits Both the Question and the Answer, With No Consent Control and an Affirmative Misrepresentation**

51. The Low Testosterone Symptom Calculator at www.hims.com/lp/tt-start-testo-symp-calc requires no account and no login. It is reachable in two clicks from the Website's footer, under "Tools." It presents eight questions about the visitor's symptoms.

52. Each of the eight answers is transmitted to api.amplitude.com as a page:click event in which the title field carries the question verbatim and the id field encodes the visitor's answer. The eight questions, each confirmed transmitted with the answer "Yes," are: "Do you feel like your energy levels are low?" (id low-t-calculator-quiz-energy-1-yes); "On some or most days, do you need to nap to feel awake and alert?"; "Do you feel like you have a low sex drive?"; "Do you sometimes have difficulty getting or keeping a hard erection?"; "Do you feel like your muscle strength is lower than it should be?"; "Do you struggle with motivation?"; "Do you feel more brain fog or less mentally sharp than before?"; and "Do you have a sad or depressed mood most of the time?" (id low-t-calculator-quiz-mood-3-yes).




*Figure 4: On the no-login Low Testosterone Symptom Calculator, both the depression-symptom question and the visitor's answer reach a third party in plain text, pre-consent.*

53. Because both the question and the answer are transmitted, the recipient learns the content of the exchange as fully as if it had read a sentence. A payload carrying the words "Do you have a sad or depressed mood most of the time?" together with an identifier ending in "-yes" discloses a self-reported depressive symptom as plainly as any sentence could, and a payload carrying "Do you sometimes have difficulty getting or keeping a hard erection?" with the same suffix discloses a self-reported symptom of erectile dysfunction.

54. There is no consent box on this surface at any point in the flow, and no consent control of any kind precedes the transmissions. Every answer is nevertheless transmitted to Amplitude, an outside company, with the visitor's Facebook advertising cookie attached.

### F. The Homepage Quiz and the Editorial Quizzes Capture Answers With No Consent Control at All

55. A quiz or pre-quiz modal appears on the Website's homepage at www.hims.com, identified in the Website's own code as ng-nn-wm-quiz-modal. A single click on an answer

transmits it to api.amplitude.com as a page:click event: "Do you have a treatment in mind already?"—"GLP-1 pills," transmitted as title = "glp-1-pills"; "Why do you want to lose weight?"—"Feel better in my clothes," transmitted as title = ["feel-better-in-clothes"]; and "What matters most to you about your treatment?"—"Results that last." No consent control is presented at any point.

56. Hims also embeds answer-capturing quizzes inside ordinary editorial articles that require no login. On the hair-trait quiz at www.hims.com/check/what-haircut-should-i-get-quiz, the answer to "How dense is your hair?"—"Thin"—is transmitted to api.amplitude.com as title = "Thin" with id = "quiz-one-buttom-thin," the identifier encoding both the question slot and the answer. No consent control is presented at any point.

### G. The Answers Are Joined to Persistent Identifiers and to the Visitor's Advertising Identity

57. The health answers do not travel alone. Each Amplitude payload also carries a set of persistent identifiers: an Amplitude device identifier that survives across sessions (for example, device_id = D6XUrMk3yFYiUlLc9F41_W); Hims's own persistent visitor cookie (hermsuid_cookie, for example a47b8ccf-a09f-4cb0-81f7-c054f5f541c9); a session identifier; a server-side identifier Hims assigns to the visit (server_unique_id); the visitor's IP address; and the visitor's operating system, device model, browser, and language. In the ordinary course, the visitor's user-agent string is transmitted as well.

58. Critically, each payload also carries hfbp_cookie—the visitor's Facebook advertising cookie (for example, fb.1.1782906565555.1699156229). Because the Facebook advertising cookie travels inside the very same message as the health answer, the answer is not anonymous. It arrives joined to the identifier by which the largest advertising platform in the world

recognizes that specific person, so the medical fact can be matched back to a real, cross-web individual and used to build or target advertising audiences keyed to the health condition.

59. The $identify transmission compounds the harm. The answer is not merely observed in passing; it is written into a durable per-person profile on Amplitude's servers as a lasting attribute of that person, where it remains after the visitor closes the browser, whether or not he ever returns, creates an account, or buys anything.

60. The payloads themselves record that no consent preceded them. In each, the fields privacy_consent_analytics, privacy_consent_advertising, privacy_consent_functional, and privacy_consent_sale_of_info are set to "Auto"—a software-library default value, not the product of any interaction by the visitor with any consent control—and the field is_logged_in is set to false. At the moment of transmission, no consent management banner had been displayed.

### H. The Health-Condition and Product Pages Transmit the Visitor's Condition on Page Load

61. At least forty-seven pages on the Website are health-condition and prescription-product pages, each public, requiring no account, and reachable in one or two clicks from the homepage. The subject matter of the page is the condition: www.hims.com/erectile-dysfunction, www.hims.com/erectile-dysfunction/sildenafil, and www.hims.com/tadalafil; www.hims.com/premature-ejaculation/sertraline-for-pe; www.hims.com/hair-loss, www.hims.com/hair-loss/finasteride, and www.hims.com/hair-loss/minoxidil; www.hims.com/weight-loss, www.hims.com/weight-loss/wegovy-pill, and www.hims.com/weight-loss/ozempic-pill; and www.hims.com/psychiatry/sertraline and www.hims.com/psychiatry/escitalopram. A single visit tells the recipient the exact condition the visitor is researching and, on the product pages, the specific prescription drug he is considering.

62. On page load, and before any banner appears, the condition-labeled visit and the visitor's identifiers leave the browser. Meta, Snap, Reddit, Microsoft (Bing), Pinterest, and Google each receive the transmission by their own pixel. Reddit receives a custom event named for the condition. Every one of these transmissions fires within the first fraction of a second of page load.

63. Hims additionally forwards the same condition-labeled events from its own servers to platform endpoints server-to-server. For Meta, Snap, and Reddit, that path duplicates their confirmed browser pixels. For TikTok, X, and PulsePoint, the server-side relay is the only observed path, and their onward receipt is a subject for discovery.

64. The Trade Desk receives the visit by pixel and matches the visitor's identifiers against its cross-web identity graph, turning an anonymous session into a real, named advertising profile with the health-condition interest attached. On the erectile-dysfunction product page, a further layer of programmatic advertising networks also fires on load, broadcasting the visit into the open market.

65. On the erectile-dysfunction product page, Meta, Snap, and Criteo each receive a product-view event on page load, each carrying that platform's identifying cookie, so each learns that the visitor viewed an erectile-dysfunction product. Hims obscures the product name and page address in that event, but the obscured value is identical for every visitor and can be matched back against Hims's known product list, so it still identifies the product; and the identifying cookie travels in the clear regardless.

66. The interception is not limited to the interactions described above. Every page address a visitor requests on the Website—including pages describing conditions, symptoms, treatments, and specific medications—is transmitted to Third-Party Recipients in real time, together with their respective persistent identifiers. This Complaint focuses on the Trackers

documented here; discovery may reveal additional recipients and additional tracking products deployed on the Website.

**I. Defendant's Responsibility for the Interception of Electronic Communications**

67. Although the Trackers perform the technical acquisition and transmission functions, Hims is legally responsible under the FSCA because it intentionally procured, enabled, directed, authorized, and caused the Third-Party Recipients to acquire the challenged communications.

68. Hims knowingly made the affirmative decision to implement the Trackers on www.hims.com. That implementation was deliberate and required Hims, or persons acting on its behalf, to configure and deploy the code, including inside the intake funnels and quizzes themselves. The tracking here is not a generic page-view tag. Hims's code is wired to fire on the selection of an answer to a health question and to place the value of the answer field into an outbound third-party payload, and to issue a second call writing that same value into a durable third-party profile. Mapping a specific health-answer field into a third-party request is an engineering decision, not an incident of ordinary website operation.

69. Hims controls, participates in controlling, or has the contractual and practical ability to control which pages and events on its Website trigger tracking. At minimum, Hims could elect not to procure tracking on its health questionnaires, its symptom calculator, its quizzes, and its condition and product pages. That Hims can make that choice is demonstrated by the Website itself: at certain steps of certain funnels—for example, the date-of-birth step and the state-selection step on the weight-loss funnel—the visitor's input was transmitted only to Hims's own first-party endpoints and not to any third party. Hims therefore knows how to keep an answer in-house, and chose not to for the answers at issue.

70. Hims also built and operates the server-side relay on its own infrastructure, an affirmative act by Hims that transmits the visitor's condition-labeled activity to advertising platforms from Hims's own servers, beyond the reach of any privacy tool the visitor might employ.

71. Without Hims's implementation and continued operation of this code, the Third-Party Recipients would not have acquired the communications at issue.

### J. Hims's Privacy Disclosures and Consent Interface Do Not Authorize the Tracking Conduct

72. Visitors are not required to affirmatively agree to anything before browsing the Website's condition and product pages, before answering the homepage quiz or an editorial quiz, before completing the Low Testosterone Symptom Calculator, or before answering the first several questions of an intake funnel.

73. The only site-wide control Hims presents is a "Your privacy choices" notice: a non-blocking corner notice that does not overlay or lock the page. Its full text reads: "We and our partners use tracking technologies to collect data about you and your site interactions, personalize ads, and improve our services. See our Privacy Policy to learn more and manage your privacy choices." It has one button: "Got it." There is no reject control, no decline control, and no opt-out of the sale or sharing of personal information. Every advertising tracker fires before the notice appears, so pressing "Got it" does not stop any transmission; it only dismisses the notice.




*Figure 5: The only site-wide consent control Hims presents. There is no option to refuse, and it appears after the advertising trackers have already fired.*

74. Hims's own front-end code names this banner "custom-wiretap-banner."

75. The Website also does not honor Global Privacy Control, the standardized opt-out preference signal that a visitor's browser transmits with every request. The Trackers fire and the data is shared even when that signal is asserted.

76. The advertising-partner disclosures in Hims's Privacy Policy name Google (DoubleClick), X (formerly Twitter), Facebook, Google Analytics, and Stripe. They do not name Amplitude. They do not name Datadog. Those are the two companies that actually receive the visitor's selected health answers, and they appear nowhere in the document.

77. Far from authorizing the tracking conduct, Hims's Privacy Policy is an admission against interest. It states: "if you view a webpage about balding or erectile dysfunction treatments, we may provide that information to an advertising partner who will then deliver advertisements to you on different websites based on your viewing activity." It further states: "NOTICE: We may sell your sensitive personal data." Hims thus concedes both the sensitivity of the information and the fact of the sharing. But the document is also its own limit: it discloses sharing with a single,

unnamed "advertising partner," while the conduct alleged here sends the visit to a stack of named recipients the policy never identifies. A generic acknowledgment that some data reaches some partner is not disclosure of, and cannot be consent to, interception by these specific companies.

78. The Telehealth Consent, the document the mid-funnel checkbox tells the visitor he "agree[s]" to, is titled "AUTHORIZATION TO USE AND DISCLOSE MY MEDICAL INFORMATION AND CONSENT TO TELEHEALTH." It authorizes the use and disclosure of medical information for diagnosis, treatment, and communication with providers. It does not mention advertising, analytics, marketing, pixels, or cookies anywhere, and it names no advertising or analytics company. A document that authorizes disclosure to clinicians for treatment is not authorization for disclosure to advertisers for marketing.

79. The only text Hims places near the health questions themselves does not supply consent either. Several funnels display a disclaimer stating that Hims "uses your responses to personalize your experience and for other uses as described in our Privacy Policy." That sentence is a passive notice, not a request for permission: it presents no choice, offers nothing to accept or refuse, and appears alongside answers that have already been transmitted. It points to a Privacy Policy that names neither Amplitude nor Datadog. And a statement that Hims itself may use a response for its own purposes is not disclosure that the response is being routed, as it is selected, to outside companies that will use it for theirs.

80. Consent is limited to the specific conduct authorized. A reasonable person would not understand a footer-linked privacy policy—let alone a treatment authorization—to permit the real-time transmission of his answer to a question about erectile dysfunction, depressed mood, or hair loss to outside analytics and advertising companies, joined to the advertising identifier by which those companies recognize him.

81. Where a checkbox exists at all, it comes too late and covers the wrong thing. The answers that precede it have already been transmitted, and checking a box cannot un-send them. The funnel continues past the box, and the answers that follow continue to be transmitted. And the documents the box references name neither of the companies that receive the answers. On the surfaces described in Sections E and F above, no box exists at any point.

82. Hims also promised the opposite of what it did. Until at least late August 2023, the Website answered the question "How does Hims ensure patient privacy?" by assuring visitors that their "medical records and sensitive information are only accessed by the medical providers managing your care." Hims advertised that it affords consumers a "100% online, private, and secure" process. Hims solicited and paid social-media influencers, whose posts it reviewed, edited, and approved, to describe its service as "discreet." Its television, radio, and podcast advertising described the platform as "totally private" and said Hims treats medical conditions "privately." These representations, as the FTC Action alleges, conveyed to consumers that Hims would not disclose their health information to third parties.

### K. The Information Hims Disclosed Is Individually Identifiable Health Information That Federal Law Forbids Disclosing, and Its Disclosure Inflicts a Distinct and Serious Injury

83. Plaintiff asserts no claim under the Health Insurance Portability and Accountability Act ("HIPAA"), and Plaintiff acknowledges that HIPAA affords no private right of action. The allegations in this Section are pleaded for two limited purposes: to establish the character and sensitivity of the information Hims disclosed and the concrete, non-speculative nature of the resulting injury to Plaintiff and Class Members, which exists independent of any statutory violation; and to establish that Hims acted knowingly, having been squarely and publicly warned that the conduct was unlawful.

84. HIPAA and its implementing regulations protect "protected health information," defined as "individually identifiable health information" transmitted or maintained in any form or medium. 45 C.F.R. § 160.103. Individually identifiable health information is health information that (1) is created or received by a health care provider, health plan, employer, or health care clearinghouse; (2) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or payment for the provision of health care to an individual; and (3) identifies the individual, or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. *Id.*

85. Hims holds itself out as a provider and coordinator of medical care. It operates the intake questionnaires by which patient information is gathered, maintains the electronic health record, transmits patient information to the medical providers with whom it contracts, routes prescriptions to pharmacies, and is the only channel through which a patient may communicate with the treating provider. Hims is a covered entity within the meaning of 45 C.F.R. § 160.103 or, in the alternative, a business associate of the affiliated medical groups through which care is furnished on its platform. Either way, Hims is subject to HIPAA's prohibitions on the unauthorized use and disclosure of protected health information, 45 C.F.R. § 164.502(a), and to the Privacy Rule's requirement of a written authorization for any disclosure of protected health information for marketing, 45 C.F.R. § 164.508(a)(3).

86. The information at issue satisfies the second prong of the definition. When a visitor answers that what he wants from treatment is "getting hard and staying hard"; that his mood today is "Sad"; that he has "a sad or depressed mood most of the time"; that he "sometimes ha[s] difficulty getting or keeping a hard erection"; that he has lost "a lot" of hair and that hair loss runs in his family; or that his weight-loss goal is "Losing 16-50 lbs" and the medication he wants is a

GLP-1 pill—he discloses information relating to his past, present, or future physical or mental health or condition and to the health care he is seeking. The Website's condition and product pages disclose the same, by the address of the page alone.

87. The identifiers transmitted alongside that information satisfy the third prong. HIPAA's de-identification provision treats a "unique identifying number, characteristic, or code"—including telephone numbers, email addresses, IP addresses, and device identifiers—as an identifier that must be removed for information to qualify for the regulatory safe harbor. 45 C.F.R. § 164.514(b)(2)(i). The transmissions here carry a persistent Amplitude device identifier, Hims's own persistent visitor cookie, the visitor's Facebook advertising cookie, a session identifier, an IP address, and device and browser details, and are written into a durable per-person profile. The Trade Desk resolves those identifiers to a named individual by design; that is its business. The information is individually identifiable, and Hims cannot claim the safe harbor.

88. Upon information and belief, Hims has not executed HIPAA-compliant business associate agreements with Amplitude, Datadog, or the advertising platforms for the tracking activities described herein, and has not obtained the HIPAA-compliant authorizations necessary to permit such disclosures for marketing or other non-treatment purposes. To the extent Hims contends that any Third-Party Recipient acted as its business associate, no such agreement could authorize what occurred, because each recipient uses what it receives for its own advertising, profiling, analytics, and identity-resolution purposes.

89. Hims had actual and constructive knowledge that its deployment of third-party trackers on its Website was unlawful. In December 2022, and as updated in March 2024, the United States Department of Health and Human Services, Office for Civil Rights, issued guidance expressly warning regulated entities that the use of third-party tracking technologies on websites—

including pixels, tags, and analytics code—that transmit protected health information to vendors without a business associate agreement or a valid individual authorization violates HIPAA. The guidance warned that this is so even where the visitor is not an established patient, and even where the transmission originates on an unauthenticated, publicly accessible webpage that addresses specific symptoms or conditions. Hims publishes privacy materials on its Website reflecting its awareness of health-privacy obligations, and it maintains extensive in-house and outside legal resources.

90. Federal law singles out this category of information for protection because its unauthorized disclosure inflicts a distinct and serious harm: it exposes the individual to embarrassment, stigma, and discrimination, and it deters people from seeking medical care at all. That is not an abstract concern for the conditions at issue here. Erectile dysfunction, premature ejaculation, depression, anxiety, obesity, low testosterone, and hair loss are conditions that people treat through an online service precisely because they will not discuss them face to face. Hims's entire business is built on that fact—it advertises discretion, and it charges for it. The disclosure of exactly the fact the visitor was trying to keep private is itself the injury, wholly apart from any statutory violation and wholly apart from any subsequent misuse of the data.

91. The injury is also ongoing and beyond the visitor's control. Once transmitted, the information may be further processed, combined with other data held by the recipient, appended to the recipient's existing profile of that person, and used or resold for advertising and profiling. Amplitude's per-person profile is durable by design. The Trade Desk's business is to resell audience access across the open web. Plaintiff's and Class Members' health answers remain in those systems today, and Hims has neither retrieved them nor, upon information and belief, requested their deletion.

### L. Plaintiff's Specific Experience

92. Plaintiff Johnathon Holbrook is a Florida resident who lives in Jacksonville, Duval County, Florida. In or about the first half of 2026, and within the applicable limitations period, Mr. Holbrook used the Website on more than one occasion while physically located in Jacksonville, Florida.

93. Mr. Holbrook came to the Website from an advertisement on Facebook for a Hims hair-loss treatment. He accessed the Website from his Apple iPhone 13, using the Safari browser, by following the link from Facebook. He did not use a virtual private network, an ad blocker, or a private or incognito browsing mode. Each of the Trackers described above therefore operated on his device in the ordinary manner alleged.

94. Mr. Holbrook completed a Hims hair-loss questionnaire, answering questions about the hair loss he was experiencing and his goals for treatment. He also answered a quiz that appeared on the Website's homepage. He also used the Website's online low-testosterone quiz and symptom calculator, answering questions about symptoms including his energy, his sex drive, and his mood. He also used the Website in connection with sexual health, answering a quiz on that subject.

95. Before interacting with the Website, Mr. Holbrook was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose his answers or his health-related browsing to the Third-Party Recipients. In the course of the treatment questionnaire he was later directed to a screen asking him to select his state and to create an account, and he created an account. He does not recall being presented with, or agreeing to, any box concerning terms of use or a telehealth consent. By the time he reached that screen, the answers he had already given had already been transmitted to Amplitude.

96. Mr. Holbrook never purchased, subscribed to, or received any product, medication, or treatment from Hims or Hers.

97. In the same manner documented above in Figures 1 through 4, each answer Mr. Holbrook selected on the hair-loss questionnaire, the homepage quiz, the low-testosterone symptom calculator, and the sexual-health quiz was transmitted in real time to Amplitude—as an event property, and again as a write to a durable Amplitude profile—together with his Amplitude device identifier, Hims's persistent visitor cookie, his Facebook advertising cookie, his session identifier, his IP address, and his device and browser information. In the same manner documented above, the health-condition and product pages he viewed were transmitted on page load to Meta, Snap, Reddit, Microsoft (Bing), Pinterest, and Google, and to The Trade Desk, which matched his identifiers against its cross-web identity graph.

98. Mr. Holbrook did not know of, and did not consent to, any of these transmissions. Had he known that his answers about his hair loss, his sex drive, and his mood would be transmitted in real time to outside analytics and advertising companies and written into a lasting profile of him, he would not have used the Website or would not have answered the questions.

99. Mr. Holbrook's information remains in the possession of the Third-Party Recipients. Upon information and belief, Hims continues to deploy the Trackers described in this Complaint in the same manner, and continues to present the same consent interface and the same disclosures. Mr. Holbrook remains interested in treatment for hair loss and would use the Website again were it not intercepting and disclosing his communications in the manner alleged.

**INJURY TO PLAINTIFF AND CLASS MEMBERS**

100. Hims's procurement of the unauthorized interception of Website visitors' communications has caused actual harm to Plaintiff and Class Members in multiple ways.

101. **Invasion of Privacy.** The information disclosed—the condition for which a visitor sought treatment, the symptom he reported, the mood he reported, the treatment he was considering, and the medication he was researching—is among the most private information an individual possesses. Its disclosure to analytics and advertising companies, joined to identifiers that name him, is a highly offensive intrusion upon seclusion and an invasion of privacy in itself.

102. **Disclosure of Information the Law Forbids Disclosing.** As alleged in Section K above, the information Hims disclosed is individually identifiable health information that federal law prohibits disclosing for marketing purposes without authorization. The injury from such a disclosure is the kind Congress and the Department of Health and Human Services have expressly recognized: exposure to embarrassment, stigma, and discrimination, and the chilling of the willingness to seek care. That harm is concrete, and it is complete upon disclosure.

103. **Commercial Exploitation and Loss of Control.** Hims caused Plaintiff's and Class Members' sensitive communications to be disclosed to analytics and advertising recipients, and used the resulting data flows to obtain advertising, measurement, audience-building, attribution, and subscriber-acquisition benefits. Plaintiff and Class Members thereby lost control over information they had communicated for the limited purpose of obtaining medical treatment, and received nothing in return for the commercial value Hims extracted from it.

104. **Diminished Confidence in Health Care Privacy.** The unauthorized interception of these communications has undermined Plaintiff's and Class Members' ability to seek medical information and treatment confidentially, and to answer a clinical intake question honestly, without fear that their answers are being routed to advertising companies.

105. **Risk of Further Use of the Intercepted Data.** Once acquired by the Third-Party Recipients, Plaintiff's and Class Members' data is beyond their control and may be further

processed, combined with other data, appended to existing profiles, and used or resold for advertising and profiling. A recipient that learns a particular person sought treatment for erectile dysfunction, depression, or obesity can target that person, price advertising to that person, and enrich the profile it already holds on that person, indefinitely.

106. **Statutory Injury.** Independent of the foregoing harms, Hims's violations of the FSCA have caused Plaintiff and Class Members to suffer statutory injury, entitling them to the remedies the statute provides, including liquidated statutory damages.

## CLASS ACTION ALLEGATIONS

107. Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

108. The Florida Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in Florida who visited Hims's Website (www.hims.com) and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Hims within the applicable limitations period.

109. Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) the Third-Party Recipients, and their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned and their immediate families and staff; and (e) Plaintiff's counsel and their immediate families.

110. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

111. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. Hims serves approximately 1.1 million active subscribers nationwide and, upon information and belief, its Website receives on the order of tens of millions of unique United States visitors each year, of which Florida residents—Florida being the third most populous State—comprise a

substantial share numbering, at minimum, in the tens of thousands and likely in the hundreds of thousands or more. The intake funnels and their landing flows are, after the homepage, the most-visited pages on the Website, and every visitor who wishes to use the service must pass through one of them and select at least one health answer.

112. **Ascertainability.** The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and by third parties. Hims's web-server logs, its funnel and account records, its server-side relay logs and configuration, and the advertising and analytics account records of the Third-Party Recipients contain records of the visitors whose electronic communications were intercepted by the Trackers during the class period. Every answer event carries a persistent device identifier, Hims's own visitor cookie, a Facebook advertising cookie, and a session identifier, and records whether the visitor was logged in, so class membership can be determined from records rather than from recollection.

113. **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Hims implemented the Trackers on its Website;

(b) Whether the Trackers acquired the contents of Website visitors' electronic communications;

(c) Whether Hims procured, enabled, directed, authorized, or caused the Third-Party Recipients to intercept Website visitors' electronic communications;

(d) Whether Hims obtained Website visitors' consent to the interception of their electronic communications;

(e) Whether Hims's conduct violated Fla. Stat. § 934.03;

(f) Whether Hims breached a duty of confidence owed to Plaintiff and Class Members;

(g) Whether Hims has been unjustly enriched through its conduct;

(h) Whether Hims's conduct constituted an unfair or deceptive act or practice within the meaning of Fla. Stat. § 501.204;

(i) Whether Plaintiff and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(j) Whether Plaintiff and Class Members are entitled to equitable relief, including declaratory and injunctive relief.

114. These common questions predominate over any individualized issues because Plaintiff's claims challenge Hims's uniform, centralized conduct—the deployment of the same tracking code across the same Website, funnels, quizzes, and condition pages, governed by the same consent interface and the same disclosures—rather than any individualized interaction between Hims and a particular Class Member. The Trackers operated in the same manner on every visitor's browser.

115. Any individualized questions—such as which particular pages a given Class Member visited, which particular answers he selected, or the precise dates of his visits—do not predominate, and in any event are answerable from Defendant's and the Third-Party Recipients' records. Courts routinely hold that predominance is satisfied in website-tracking cases because the core liability inquiry focuses on the defendant's uniform deployment of tracking technology without consent, not on the content of any individual visitor's session.

116. **Typicality.** Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and Class Members all visited Hims's Website and had the contents of their electronic

communications intercepted by the Third-Party Recipients without their consent, arising from the same practices and course of conduct and based on the same legal theories.

117. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests adverse or antagonistic to those of the Class, and has retained counsel experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the interception of electronic communications in the health care context. Plaintiff and his counsel intend to prosecute this action vigorously.

118. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members individually to redress the wrongs done to them. Prosecution of separate actions would create a risk of inconsistent or varying adjudications and would be inefficient for the parties and the Court. A class action presents far fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

119. **Injunctive and Declaratory Relief.** Hims has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole under Rule 23(b)(2). Hims's conduct is ongoing, and the Trackers, the consent interface, and the disclosures challenged here remain in place.

120. **Issue Certification.** Alternatively, Plaintiff seeks certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and narrow any individualized questions that may remain after the class-wide issues are resolved.

## CAUSES OF ACTION

### COUNT I
### Violation of the Florida Security of Communications Act
### (Fla. Stat. § 934.03)
### (On Behalf of Plaintiff and the Class)

121. Plaintiff incorporates paragraphs 1–120 above as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

122. The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). The FSCA is an all-party consent statute: interception is lawful only where *all* parties to the communication have given prior consent. Fla. Stat. § 934.03(2)(d).

123. The FSCA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It defines "contents," when used with respect to any communication, to include "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was designed to protect precisely the privacy interest invaded here.

124. The transmissions between Plaintiff and Class Members and Hims's Website constitute "electronic communications" within the meaning of Fla. Stat. § 934.02(12), because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

125. The Trackers deployed on Hims's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session-replay technology that merely records mouse movements, the Trackers here actively acquire and transmit the contents of visitors'

communications, including the answer the visitor selected to each health question and the address of the condition or product page he requested.

126. The Trackers intercept the "contents" of Plaintiff's and Class Members' electronic communications, not merely routing or addressing information. The answer to "How do you want to improve your performance?", the answer to "how are you feeling today?", the answer to "Do you have a sad or depressed mood most of the time?", and the answer to "Which best represents your hair loss and goals?" are the substance, purport, and meaning of the visitor's communication. On the Low Testosterone Symptom Calculator, the question itself is transmitted verbatim alongside the answer. These are contents in the most literal sense the statute contemplates.

127. The interception is contemporaneous with transmission. The Trackers acquire each answer in the instant it is selected, as the communication is being made, and transmit it from the visitor's browser to the Third-Party Recipients in real time.

128. Hims intentionally procured the Third-Party Recipients to intercept these electronic communications by deliberately implementing the Trackers on its Website, by configuring that code to place the visitor's health answers into outbound third-party requests, and by operating a server-side relay that forwards the same information from its own infrastructure.

129. Neither Plaintiff nor Class Members consented to this interception. They were presented with no consent control at all on several of the surfaces at issue; on the remainder, the only control presented offered no way to refuse, appeared after the transmissions had already occurred, and referred to documents that named neither Amplitude nor Datadog. The FSCA requires the consent of all parties, and Hims obtained the consent of none.

130. As a direct result of Hims's violations, Plaintiff and Class Members are entitled to: (a) actual damages, or liquidated statutory damages computed at the higher of $100 per day for

each day of violation or $1,000; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs reasonably incurred. Fla. Stat. § 934.10(1).

131. Plaintiff and Class Members are also entitled to preliminary and other equitable or declaratory relief as appropriate, Fla. Stat. § 934.10(1)(a), including an injunction preventing Hims from continuing to deploy the Trackers to intercept their electronic communications without the consent of all parties.

**COUNT II**
**Breach of Confidence**
**(On Behalf of Plaintiff and the Florida Class)**

132. Plaintiff incorporates paragraphs 1–120 above as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

133. A claim for breach of confidence requires an "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc). The claim is rooted in the principle that the law should recognize certain relationships as confidential in order to encourage the free flow of information within them.

134. Under Florida law, a confidential relationship exists where "confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). Whether a confidential relationship exists is ordinarily a question of fact not appropriately resolved on a motion to dismiss.

135. A confidential relationship existed between Hims and Plaintiff and Class Members. Hims holds itself out as a telehealth company that furnishes and coordinates medical care; it invites visitors to disclose their conditions, symptoms, moods, treatment goals, and medical histories for the express purpose of obtaining that care; it publishes privacy materials representing that it safeguards the information visitors submit; and it advertised that visitors' "medical records and

sensitive information are only accessed by the medical providers managing your care," that its process was "100% online, private, and secure," and that its service was "discreet" and "totally private." Hims solicited the confidence and accepted the trust.

136. The information Hims disclosed is nonpublic. It includes the plain-text answers Plaintiff and Class Members selected on Hims's health questionnaires, quizzes, and symptom calculator; the conditions, symptoms, moods, family histories, treatment goals, and medications those answers identify; and the addresses of the condition and product pages they requested, each of which encodes the condition being researched.

137. Hims disclosed that nonpublic information to third parties. By deploying and procuring the Trackers on the Website and by operating its server-side relay, Hims caused visitors' communications to be transmitted in real time to Amplitude, Datadog, and the advertising and identity-resolution companies identified above, together with persistent cookies and identifiers—including the visitor's Facebook advertising cookie—permitting those recipients to link the health information to a specific, identifiable person and to write it into durable profiles.

138. The disclosures were unconsented and unprivileged. Plaintiff and Class Members were never presented with any adequate request for permission before their communications were transmitted, and never authorized Hims to disclose their health-related communications to analytics and advertising companies. The footer-linked Privacy Policy, the "Got it" notice, and the Telehealth Consent neither disclosed nor authorized what occurred, and named neither company that received the answers.

139. Hims breached the confidence reposed in it. It made the deliberate decision to deploy and procure the Trackers on precisely those functions through which visitors disclose their most sensitive information—the intake questionnaires, the symptom calculator, the quizzes, and

the condition and product pages—and it did so with knowledge, including from the guidance of the Department of Health and Human Services, Office for Civil Rights, described above, that doing so transmits protected health information to third-party vendors.

140. As a direct and proximate result of Hims's breach of confidence, Plaintiff and Class Members have been injured. They suffered an invasion of privacy, lost control over their confidential health information, sustained a diminished ability to seek medical information and care in confidence, and face the ongoing risk that the disclosed information will be further processed, combined with other data, and used or resold for advertising and profiling.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class, Pleaded in the Alternative)**

141. Plaintiff incorporates paragraphs 1–6, 16–82, and 92–99 above as if fully set forth herein and brings this Count individually and on behalf of the proposed Class. This Count does not incorporate the paragraphs alleging Defendant's violations of the FSCA, of FDUTPA, or of HIPAA, its breach of confidence, or the injury allegations, and does not rely on any of them to supply the unjust factor.

142. Plaintiff pleads this Count in the alternative to Counts I, II, and IV, and to the extent Plaintiff and Class Members are found to have no adequate remedy at law. It rests on the independent equitable principle that Hims solicited, received, and retained the benefit of Plaintiff's and Class Members' personal and health-related data without paying for it.

143. Hims received a benefit from Plaintiff and Class Members by inducing them to provide valuable personal and health-related data through the Website's intake questionnaires, quizzes, symptom calculator, and condition and product pages, and then putting that data to use for its own commercial purposes.

144. By implementing the Trackers on its Website and by operating its server-side relay, Hims obtained analytics, conversion measurement, retargeting, audience-building, advertising attribution, and subscriber-acquisition benefits. Those benefits enabled Hims to identify and retarget high-intent prospects, improve the efficiency of the paid digital advertising on which its business depends, and increase the volume of consultations, prescriptions, and subscriptions, thereby enriching itself at the expense of Plaintiff and Class Members.

145. Private information, and in particular sensitive health-related information, has value. Hims's own Privacy Policy states that Hims "may sell your sensitive personal data," an acknowledgment by Hims that the data it took has market value.

146. Hims knowingly accepted and retained the analytics, advertising, attribution, audience, and acquisition benefits produced through the challenged transmissions. Hims has never compensated Plaintiff or Class Members for the data that generated those benefits, and it would be inequitable for Hims to retain the value it received without paying fair value for it.

147. Because Hims retained a benefit conferred by Plaintiff and Class Members without paying its fair value, Plaintiff and Class Members are entitled to restitution and disgorgement of the profits, benefits, and other compensation Hims obtained from the use of their personal and health-related data.

## COUNT IV
## Violation of the Florida Deceptive and Unfair Trade Practices Act
## (Fla. Stat. § 501.201, et seq.)
## (On Behalf of Plaintiff and the Class — Declaratory and Injunctive Relief Only)

148. Plaintiff incorporates paragraphs 1–120 above as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

149. FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Fla. Stat. § 501.204(1). The Act is to be construed liberally to protect the consuming public. Fla. Stat. § 501.202(2).

150. Hims is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8): it advertises, solicits, offers, and distributes medical treatment, prescription medications, and related services to consumers in Florida.

151. **Plaintiff seeks no damages under this Count.** Plaintiff brings this Count solely for the declaratory and injunctive relief that Fla. Stat. § 501.211(1) affords to "anyone aggrieved by a violation" of the Act, together with the attorneys' fees and costs available under Fla. Stat. § 501.2105. Actual damages are not an element of a claim for declaratory or injunctive relief under § 501.211(1); that requirement applies only to a claim for damages under § 501.211(2). *See Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000) (holding that a plaintiff need not prove actual damages to obtain injunctive relief under FDUTPA, because the availability of injunctive relief turns on protection of the consuming public rather than on individual loss). Plaintiff expressly disclaims any recovery of damages under this Count.

152. Plaintiff is a person aggrieved by Hims's violations: he used the Website, answered its health questions, and had the contents of those communications and his health-related browsing disclosed to the Third-Party Recipients as a result of the practices described below.

153. Hims's conduct is deceptive. Hims represented to consumers that their "medical records and sensitive information are only accessed by the medical providers managing your care," that its process is "100% online, private, and secure," and that its service is "discreet" and "totally private," while transmitting the answers to its health questions to Amplitude and Datadog and transmitting condition-labeled page visits to Meta, Snap, Reddit, Microsoft, Pinterest, Google, and

The Trade Desk. Those representations were likely to mislead, and did mislead, consumers acting reasonably under the circumstances.

154. Hims's conduct is independently deceptive by omission. In making those representations, Hims failed to disclose, and failed adequately to disclose, that it shares consumers' sensitive health information with analytics and advertising companies. That fact would be material to a reasonable consumer's decision whether to answer Hims's health questions at all.

155. Hims's health quizzes carry a further, specific misrepresentation. Directly beneath the answer choices, the hair-loss quiz tells the visitor that "[t]he quiz is not a medical assessment and your responses will not be shared with a medical provider"—while the answer he selects is transmitted, in the instant he selects it, to Amplitude and Datadog with his Facebook advertising cookie attached. The Low Testosterone Symptom Calculator transmits every answer the same way—including the visitor's answers concerning his sex drive, his erectile function, and whether he has "a sad or depressed mood most of the time"—with no consent control of any kind anywhere in the flow.

156. Hims's consent interface is itself an unfair and deceptive practice. A notice whose only action is to accept, which offers no equally available means to refuse, which appears only after the tracking has already occurred, and which is presented on a Website that does not honor the browser's Global Privacy Control opt-out signal, is a design that subverts and impairs consumer choice. It gives the appearance of a privacy control while providing none. Hims's own code names the mechanism "custom-wiretap-banner."

157. Hims's conduct is also unlawful, and an act that violates another law is an unfair or deceptive practice under FDUTPA. Hims's interception of Plaintiff's and Class Members' electronic communications violates Fla. Stat. § 934.03, as alleged in Count I.

158. The FTC Action alleges the same deceptive privacy representations and the same failure to disclose, on behalf of the Federal Trade Commission, the People of the State of California, and the Utah Division of Consumer Protection. It also alleges that Hims did not stop the conduct when consumers complained, and did not stop when it learned of the FTC's investigation.

159. Declaratory and injunctive relief is necessary and appropriate. Upon information and belief, Hims continues to deploy the Trackers, continues to operate the server-side relay, continues to present the same "Got it" notice with no means of refusal, continues to disregard Global Privacy Control, and continues to omit Amplitude and Datadog from its Privacy Policy. Plaintiff's and Class Members' answers remain in the Third-Party Recipients' systems, and Plaintiff would use the Website again for hair-loss treatment were the practices enjoined. Absent an injunction, Plaintiff, Class Members, and the consuming public will continue to be subjected to the same practices.

160. Plaintiff, on behalf of himself and the Class, is entitled to a declaration that the practices described above violate Fla. Stat. § 501.204, to a permanent injunction under Fla. Stat. § 501.211(1) restraining those practices, and to reasonable attorneys' fees and costs under Fla. Stat. § 501.2105.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other Class Members similarly situated, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

(b) Declare that Hims's actions, as described herein, violate the FSCA and FDUTPA and constitute a breach of confidence and unjust enrichment;

(c) Award Plaintiff and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiff and the Class liquidated statutory damages as provided by the FSCA, computed at the higher of $100 per day for each day of violation or $1,000 per Class Member;

(e) Award Plaintiff and the Class punitive damages;

(f) Award Plaintiff and the Class restitution and disgorgement of all profits, benefits, and other compensation Hims obtained from the use of Plaintiff's and Class Members' personal and health-related data;

(g) Enter a declaratory judgment and a permanent injunction under Fla. Stat. §§ 501.211(1) and 934.10(1)(a) requiring Hims to cease procuring the interception of Website visitors' communications without the consent of all parties; to disable or segregate the Trackers from its intake questionnaires, symptom calculators, quizzes, condition pages, product pages, and other health-related functions unless valid prior consent and authorization are obtained; to cease transmitting condition-labeled events through its server-side relay; to request the deletion of improperly transmitted data from the Third-Party Recipients; to present a consent mechanism that affords a means of refusal as easy and prominent as the means of acceptance; to honor the Global Privacy Control signal; and to disclose accurately and conspicuously every category of recipient to which it transmits visitors' health information;

(h) Award Plaintiff and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiff and the Class reasonable attorneys' fees and costs, as allowed by law, including under Fla. Stat. §§ 934.10(1)(d) and 501.2105; and

(j) Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 01, 2026

Respectfully submitted,

By: */s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.,
**LEAD COUNSEL**
Florida Bar No. 93014
SCHWARTZBAUM
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email:
admin@schwartzbaum.com

*Counsel for Plaintiff and the Proposed Class*